UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

   v.

CHRISTOPHER THOMPSON, et al.

Criminal No. 16-CR-10014-PBS-1

**DEFENDANTS' MEMORANDUM IN SUPPORT OF
THEIR MOTION TO DISMISS THE INDICTMENT IN ITS ENTIRETY**

**i. Introduction**

Defendants Christopher Thompson ("Thompson"), Kimberly Thompson ("K. Thompson"), AQE, Inc. ("AQE") and Air Quality Experts, Inc. ("Air Quality") (together, "Defendants") respectfully submit this memorandum in support of their motion to dismiss the Indictment in its entirety.

The Indictment (and all counts thereof) necessarily fails as a matter of law where it is predicated upon a legally untenable assumption—that the alleged "victims" here, the Massachusetts Laborers' Benefits Funds (the "Funds"), were ever entitled to the monies of which the Government alleges Defendants defrauded them and kept for themselves. Under clear and settled civil labor law the Funds had no such entitlement, and this is fatal to the Indictment.

As discussed below, under federal ERISA law a union company, i.e., one which is a signatory to a collective bargaining agreement ("CBA") with a union, is obligated to make contributions to employee benefit plans in accordance with the terms of the CBA. 29 U.S.C. § 1145. Conversely, a non-union company which is not a signatory to a CBA, by definition, is under no such obligation. Businesses are often set up to include both union and non-union

companies. Such a structure is known as a "double breasted" operation and is considered lawful under applicable laws.  In very limited circumstances, however, civil liability for CBA obligations may be imposed upon the non-union company of a "double breasted" operation on the basis of an "alter ego" theory.  In particular, courts have determined that where a union company which is a signatory to a CBA fraudulently sets up and conducts business through a non-union company in order to avoid its obligations to make benefit contributions under a CBA, the non-union company may be held liable for the contributions as an "alter ego" of the union company.  As courts have expressed it, the animating purpose of the alter ego doctrine is to prevent union employers from evading their collective bargaining obligations by fraudulently "shifting union work to a non-union company." S. California Painters & Allied Trades, Dist. Council No. 36 v. Rodin & Co., 558 F.3d 1028, 1032–33 (9th Cir. 2009).

The Government's theory of "fraud" here  attempts to turn the alter ego doctrine on its head by asserting that an existing and operating *non-union company* can somehow become liable for benefit contributions where it later sets up a union company which becomes a party to a CBA.  Courts considering this so-called "reverse alter ego" theory have rejected it, especially where it is axiomatic that a non-union company's establishment of a union company *to do union work* expands job opportunities for union members and, importantly, because there can be no fraud where the union, in entering into a CBA with the later established union company, is fully on notice of the already existing non-union company and therefore cannot be defrauded about the corporate structure and the fact that work will continue on a non-union basis. The Indictment runs afoul of this settled law.

Here, the Indictment concedes, as it must, that Defendants allegedly established and operated Air Quality, a nonunion company, *for 18 years*, and *thereafter* set-up AQE in 2005, a

union company which at that time became a signatory to a CBA. <u>See</u> Indictment,  ¶¶ 2–4. Courts have rejected efforts to impose civil liability on the non-union company under these circumstances.  As importantly here, the Indictment fails even to make any allegation that the Defendants fraudulently shifted union work from AQE, the union company, to Air Quality, the non-union company. Indeed, the Indictment *does not allege* that the Defendants defrauded *the union* itself in any respect. This too is fatal to the Indictment.[1]

The First Circuit laid the analytical groundwork for the rejection of the reverse alter ego theory upon which the Indictment relies in its seminal decision in <u>Massachusetts Carpenters Cent. Collection Agency v. A.A. Bldg. Erectors, Inc.</u>, 343 F.3d 18, 21–22 (1st Cir. 2003) and, thereafter, the First Circuit's rationale has been cited by courts across the country rejecting such a theory. For example, and as discussed below, in 2009 the Ninth Circuit declined to adopt the "reverse" alter ego doctrine upon which the Indictment relies: "***Because the alter ego doctrine prevents union companies from avoiding collective bargaining obligations, it does not apply in the 'reverse' where a non-union company creates a union company because the non-union company has no collective bargaining obligations to avoid***." <u>Rodin</u>, 558 F.3d at1032–33 (emphasis supplied).

As the First Circuit explained in <u>A.A. Building Erectors</u>, *even where* the union and non-union companies are alleged to have been "joined at the hip" through the sharing of employees, equipment, facilities and other resources, as the Indictment alleges here (<u>see</u> Indictment, ¶¶ 3, 12), where the non-union company precedes the establishment of the union company that is "not enough" to establish *civil* liability. 343 F.3d at 21–22; <u>Massachusetts Carpenters Cent. Collection Agency v. A.A. Bldg. Erectors, Inc.</u>, 208 F. Supp. 2d 94, 98-99 (D. Mass. 2002) (Stearns, J.)

---

[1] Taking the Indictment to its logical extreme, the Government seems to suggest that simply operating a "double breasted" business is a crime. It is not.

aff'd, 343 F.3d 18 (1st Cir. 2003) (it is "self-evident" that the alter ego doctrine does *not* apply where the non-union company *precedes* the union company, because "[t]he alter ego doctrine, in short, does not contemplate the case of a non-union company seeking a lawful means to employ union workers without sacrificing its non-union status"). "The alter ego doctrine was never intended to coerce a non-union company into becoming a union company by requiring its compliance with a collective bargaining agreement it never signed . . . ." Rodin, 558 F.3d at 1032–33.

The Government is fully aware of the defect in the Indictment. Counsel for the Funds effectively warned the Government pre-Indictment that its purported theory here did not rise even to the level of a civil violation when the Funds supplied the Government with a privileged memorandum written by their own labor counsel. The memorandum (which the Government produced in this case) openly conceded that because the non-union company, Air Quality, preceded the union company, AQE, the Funds lacked a sufficient basis to bring a civil collection action against AQE and Air Quality. The memorandum further conceded that the Funds were well aware that Air Quality was a non-union company *before* the formation of AQE where the union had engaged Air Quality through project-specific agreements prior to the formation of AQE.[2]

In relevant part, the memorandum states as follows:

> We have not uncovered sufficient grounds, at this point, to question the legitimacy of the relationship between AQE, Inc./Air Quality Experts, Inc. The non-union company (Air Quality Experts) was organized in New Hampshire in 1987. It signed three project agreements with the Union in 2005 and then signed a statewide agreement under AQE, Inc., which was incorporated in New Hampshire in 2005. In addition, **AQE** and **Air Quality Experts** only overlapped on one project revealed by our search.

---

[2] Indeed, it is beyond dispute here that the Union knew full well that Air Quality was a long time nonunion company where the Union had tried unsuccessfully to organize Air Quality prior to the formation of AQE.

> **Air Quality Experts** has a New Hampshire business address only. It appears that **AQE's** New Hampshire address is the same as its corporate officers' address although it also has a residential Massachusetts address. ***They seem to be union by convenience, and only bid work under AQE to work for union general contractors. Given the court's skepticism about union companies established after known non-union companies, AQE/Air Quality Experts is not a good candidate for an alter-ego based collection suit at this time.***

Memorandum from Anne R. Sills to Massachusetts Laborers' Benefits Funds Delinquency Committee (Apr. 4, 2013), a true and correct copy of which is attached here as <u>Exhibit A</u>, at 3 (emphasis in italics supplied, other emphasis in original).[3] Where the Government was warned that it was pursuing a criminal Indictment that did not set forth even a civil violation, the Indictment must be dismissed.

Defendants acknowledge that the Indictment does include an allegation of fraud that does not rely upon the Government's legally untenable "reverse alter ego" theory, namely that AQE itself allegedly failed to make remittances to the Funds related to AQE employees' so-called "shop hours." Indictment, ¶ 14. However, as discussed below, this allegation fails for the simple reason that the language of the CBAs placed at issue by the Indictment does not include "shop hours" in the definition of "work" for which AQE was required to make remittances. Indeed, the Indictment fails even reference the CBAs in advancing the "shop hours" allegation, thus tacitly conceding that the actual language of the CBAs is fatal to this allegation.

Finally, under the circumstances present here, the Court should also dismiss the Indictment on vagueness grounds. The idea that Defendants could possibly have been on notice that the conduct alleged here could be criminal finds no basis in reality where at most—and

---

[3] For reasons similar to those set forth herein, Air Quality and AQE recently moved to dismiss a civil complaint brought by the Funds pending in this district; a lawsuit no doubt inspired by the grand jury investigation. <u>See</u> *McAnarney, et al. v. AQE, Inc., et al.* (Zobel, J.), C.A. No. 15-13891 RWZ. After receiving the motion to dismiss, the Funds quickly agreed that it raises "complex legal issues" and further agreed to a stay of the proceedings in order to pursue mediation before the Honorable Nancy Gertner (Ret.). <u>See</u> Docket Entries 61–64.

Defendants submit that the law with regard to "double breasted" operations is clear in their favor—there are complex and highly contested issues about the operation of "double breasted" businesses which are often the subject matter of contested civil disputes between benefit funds and employers.

The United States Supreme Court has recognized on numerous occasions that criminal laws must give "ordinary people" notice that the charged behavior constitutes a crime, see Kolender v. Lawson, 461 U.S. 352, 357 (1983). Numerous courts have recognized that the Government's use of the federal mail fraud statute, in particular, can bring with it the risk of improperly attempting to criminalize lawful behavior. See, e.g., McNally v. United States, 483 U.S. 350, 356 (1987) (reversing conviction under the mail fraud statute because the conduct the Government alleged was outside the bounds of that statute). Here, where the conduct being prosecuted does not even rise to the level of a violation of the civil law, Defendants could never have anticipated that the Government would use the federal mail fraud, embezzlement and ERISA laws to criminalize the lawful operation of "double breasted" contracting businesses.

For these reasons, discussed in greater detail below, Defendants respectfully submit that the Court should dismiss the Indictment in its entirety.

### ii. The Indictment

On January 19, 2016, the Government charged Defendants in a thirty-seven (37) count Indictment alleging violations of 18 U.S.C. § 1341 (Mail Fraud, Counts 1–18), 18 U.S.C. § 664 (Theft or Embezzlement from Employee Benefit Plain, Count 19), and 18 U.S.C. § 1027 (False ERISA Statements, Counts 20–37). The Government also brought forfeiture allegations against Defendants, charging that upon the conviction of any of the alleged violations of 18 U.S.C. § 1341 Defendants must forfeit any property derived from the commission of the alleged offenses.

6

The Indictment is directed at Defendants' operation of Air Quality and AQE from September 2005 through October 2014 and alleges as follows:

**The Alter Ego Allegations**

Thompson and K. Thompson, who are husband and wife, together owned and operated Air Quality and AQE. Indictment, ¶ 1. Thompson was the president of Air Quality. K. Thompson was the president of AQE. Id. The Indictment does not allege that Thompson held any position at AQE. Id. Air Quality, an asbestos removal company, is a non-union company incorporated in New Hampshire in 1987. Id. ¶ 2. The Indictment concedes by omission—and it is undisputed here—that Air Quality was a non-union company and that it did not execute a CBA with any union during the time period placed at issue by the Indictment. Id. AQE, an asbestos removal company, was incorporated in New Hampshire in 2005, *eighteen years* after the formation of Air Quality. Id. The Indictment alleges that Air Quality and AQE shared management, equipment, and employees. Id. at ¶¶ 3, 12.

The Indictment further alleges that on September 22, 2005,[4] AQE agreed to be bound to the terms of a CBA with the Massachusetts Laborers' District Council ("MLDC" or "the Union").[5] The Indictment references three versions of the CBA signed by AQE for the following time periods: 1) July 1, 2004 through June 30, 2008; 2) July 1, 2008 through June 30, 2012, and 3) July 1, 2012 through June 30, 2016. Id. True and correct copies of those CBAs are attached hereto as Exhibits C, D, and E, respectively.

---

[4] A true and correct copy of The Massachusetts Laborers' District Council Wreckers' Acceptance of Agreement and Declaration of Trust dated September 22, 2005, through which AQE, but not Air Quality which had existed for eighteen years at the time, agreed to the terms of the CBA is attached hereto as Exhibit B.

[5] The MLDC of the Laborers International Union of North America ("LIUNA") is an organization in which employees in the demolition industry participate through their local union to deal with employers concerning various matters related to their employment and compensation. Id. ¶¶ 4–5. The Building Wreckers' Local Union 1421 ("Local 1421") is located in Woburn, Massachusetts and is an affiliate of the MLDC. Id. ¶¶4–6.

The Indictment alleges that each CBA required AQE to make "fringe benefit contributions" to various employee welfare and pension benefit plans operated by the Funds, Id. ¶ 7, that each month AQE sent the Funds "remittance reports" setting out the hours worked by members of the union for AQE and checks for the "fringe benefit contributions" under the CBAs based upon those hours, Id. ¶ 9, and that AQE and Air Quality were a "single business" because they shared a workforce, equipment, and management. Id. ¶ 12.

The Indictment is remarkable for what is does not, and cannot, allege. It does not allege that:

- AQE ever shifted Union work to Air Quality to avoid AQE's obligations under the CBA;[6]

- Air Quality and AQE deceived the Union about the corporate structure of Air Quality or AQE before, during or after the time AQE signed the CBAs;

- Air Quality and AQE deceived the Union about the allegedly close relationship between those companies;

- any structural change to either Air Quality or AQE harmed the Union; or

- the Union was harmed in any respect.

Instead, the Indictment openly concedes at paragraph 12 that business was conducted by either Air Quality or AQE "depending upon the unique circumstances of each job" and "under

---

[6] To the contrary, and as Air Quality's office manager has sworn in an affidavit filed in *McAnarney, et al. v. AQE, Inc., et al.* (Zobel, J.), C.A. No. 15-13891 RWZ, Air Quality shifted work *to union company AQE* that benefited the Union and the Funds:

> Air Quality did not perform any job instead of AQE in order to avoid making benefit contributions required by AQE's CBA. Instead, Air Quality added to the volume of AQE's union work, and consequently to the contributions AQE made to the benefits funds. This is because on several occasions, Air Quality subcontracted work to AQE to benefit the Union. In fact, Air Quality provided AQE with its largest ever project, a $4.8 million job for Taunton Lighting Plant. That project opened on March 25, 2009, and resulted in over $500,000 in union wages and substantial remittances to the Union's benefit funds that they never would have received if Air Quality had not chosen to subcontract that project to AQE.

Dkt. No. 53, ¶ 14.

the non-union signatory Defendant Air Quality *whenever conditions permitted* because that choice was generally financially advantageous." (emphasis supplied). The Indictment thus openly concedes that Defendants conduct of business via Air Quality occurred when that "choice" was "permitted" by the job contract.

The Indictment nevertheless alleges that Defendants "violated the CBAs" and thereby defrauded the Funds—not the Union—because they did not report to the Funds or pay remittances as to hours that Union employees worked *for Air Quality*, the company formed almost two decades before AQE and which itself never agreed to or signed any CBA. Id. ¶¶ 11–15. Notably, the Indictment fails to allege that any of those Union members worked for Air Quality on Union jobs, and thus implicitly concedes that they did not. Id. In other words, the Indictment apparently alleges it was a crime for Air Quality to employ Union members to do non-union work on non-union jobs, and allegedly "conceal" from the Funds that it did so.

**The Shop Hours Allegation**

With respect to "shop hours," the Indictment alleges that as part of the "scheme" AQE did not report "shop hours"—as the Indictment purports to define them—even though that term is nowhere mentioned or defined in the CBAs and the Indictment itself does not allege that "shop hours" are even subject to the CBAs. Id. ¶ 14.

Upon AQE's agreement to be bound by the first CBA, the Funds sent K. Thompson a letter dated October 19, 2005, which explained that the CBA applied to the "work" as defined in the CBA: "As you know, your collective bargaining agreement applies to all ***laborers' work as set forth in that collective bargaining agreement*** which is performed by ***employees of your company [AQE]***." Id., ¶ 10 (emphasis supplied).

Consistent with that letter dated October 19, 2015, the CBA defined the work subject to the agreement in Article XVIII, Section 2, entitled "WORK JURISDICTION COVERAGE AND DESCRIPTION OF BUILDING WRECKING AND ENVIRONMENTAL REMEDIATION LABORERS' SPECIALIST WORK." Id. ¶ 8. The Indictment alleges that this section "states in pertinent part" that the work covered by the CBAs is: "The removal, handling and / or packing of asbestos, lead pain, microbial, mold and all hazardous and toxic materials, oil and fuel tanks and other contaminates shall be the work of the environmental remediation laborers." Id.

The Indictment alleges that the covered work under the CBAs alleged to be at issue in this case includes "shop hours," which it purports to define as the time spent preparing and traveling to a job site, or time returning and unloading trucks and equipment at the end of the day. However, a review of the actual definition of work, in its entirety, makes clear that the definition does not include "shop hours." Id., Exs. C, D, and E at Article XVIII, Section 2. To the contrary, the CBAs at Article II, Section 7 as to "Subcontracting" provide that the terms of the CBAs are not applicable to subcontractors for "transportation or trucking."[7] Exs. C, D, and E.

Finally, the most recent, and current, version of the CBA applicable from July 1, 2012 through June 30, 2016 in fact expands the scope of subcontracting services that are *not* subject to the terms of the CBA. Ex. E, at Article II, Section 7. It provides that "[t]he Employer may utilize

---

[7] In full, that section provides:

   *Section 7. Subcontracting:* The Employer agrees that the wages, including Health & Welfare, Pension and Training, Annuity, New England Laborers' Labor-Management Cooperation Trust, Legal Services, Unified Trust and New England Laborers' Health & Safety Fund contributions, and hours provided for by this Agreement shall encompass the entire work covered by this Agreement, thereby applying equally to any subcontract let by the Employer on work covered by this Agreement at the site of any job. (See the Side Letter of Agreement on Page 38).
   The Employer further agrees to refrain from subletting any work covered by this Agreement to be done at the site of the contracted project, except where such subcontractor subscribes and agrees to be bound in writing by this Agreement and complies with all of the terms and conditions of this Agreement.
   This Section shall not apply to file bidders on projects that carry file sub-bidders and to vendors furnishing material solely or to any person furnishing trucking or transportation.

non-union subcontractors of its choice" for any work so long as the subcontractor has workers compensation insurance. Id.[8]

### iii. The Legal Standard

An Indictment that fails to state an offense is subject to dismissal under Fed. R. Crim. P. 12(b)(3). See United States v. McCormack, 31 F. Supp. 2d 176, 177 (D. Mass. 1998) (dismissing Indictment where "the conduct allegedly engaged in by the Defendant" did not meet the elements of the statute at issue). In deciding a Rule 12(b)(3) motion to dismiss for failure to state an offense, the Court may decide any questions of law that "can be determined without a trial on the merits." Fed. R. Crim. P. 12(b). While it is generally sufficient for an indictment to track the language of a statute and to provide the defendant with notice of what conduct is challenged, the court may decide motions to dismiss charges that raise questions of law where the facts are or cannot be undisputed. See United States v. Nippon Paper Indus. Co., 109 F.3d 1 (1st Cir. 1997) (analyzing without any comment on procedural propriety, district court decision dismissing indictment on grounds that no offense was stated as a matter of law); see also United States v. Stevens, 778 F. Supp. 2d 683, 692 (W.D. La. 2011) ("'[A] question of law presented in a case involving undisputed facts can be determined without a trial of the general issue," and a district court is, thus, authorized to rule on such a motion to dismiss under Rule 12.") (quoting United States v. Flores, 404 F.3d 320, 325 (5th Cir.2005)).

An indictment must "specif[y] the elements of the offense charged, fairly apprise[] the defendant of the charge against which he must defend, and allow[] him to contest it without fear

---

[8] In full, the pertinent langue of Article II, Section 7 states:

The Employer may utilize non-union subcontractors of its choice provided that prior to the project start date the Employer confirms with the Business Manager of the Massachusetts & Northern New England Laborers' District Council that the non-union subcontractor carries workers compensation insurance. In the even an additional subcontractor is deemed necessary during the course of the project, the Employer shall immediately notify the above Business Manager and confirm that the additional subcontractor carries workers compensation insurance.

of double jeopardy." United States v. Eirby, 262 F.3d 31, 37–38 (1st Cir. 2001). In order to

sufficiently meet these criteria, the indictment "must be accompanied with such a *statement of*

*the facts and circumstances* as will inform the accused of the specific offence, coming under the

general description, with which he is charged." United States v. Troy, 618 F.3d 27, 34 (1st Cir.

2010) (emphasis added); *see* Fed. R. Crim. P. 7(c)(1). "To be sufficient, an indictment must

fairly state all the essential elements of the offense." United States v. Camp, 541 F.2d 737, 739

(8th Cir. 1976). "[E]very necessary allegation in an indictment must be directly and affirmatively

alleged, and … charges by implication, intendment or conclusion are insufficient." United States

v. Minnec, 104 F.2d 575, 577 (7th Cir. 1939). "The failure of an indictment to detail each

element of the charged offense generally constitutes a fatal defect." United States v. Keith, 605

F.2d 462, 464 (9th Cir. 1979).

Where an indictment omits essential elements of the charged offense, it fails to inform

the defendant of the specific crime that he is alleged to have committed, and the charges should

be dismissed. See United States v. Tomasetta, 429 F.2d 978, 979 (1st Cir. 1970) (dismissal for

failure to identify victim). The words employed must "fully, directly, and expressly, without any

uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to

be punished." Hamling v. United States, 418 U.S. 87, 117 (1974). "The mere conclusion that the

defendant[s] [have] violated the statute does not supply the necessary factual allegations."

United States v. Numrich, 144 F. Supp. 812, 813 (D. Mass. 1956).

In ruling on a motion to dismiss, the court may consider extrinsic evidence necessary to

decide the questions of law presented by pre-trial motions.  United States v. Washington, --- F.

Supp. 3d ---, 2015 WL 5522286, at *3 (E.D. Cal. Sept. 17, 2015); see United States v. Levin, 973

F.2d 463, 467 (6th Cir. 1992) ("district courts may make preliminary findings of fact necessary

to decide questions of law presented by pretrial motions so long as the trial court's conclusions do not invade the province of the ultimate finder of fact."); <u>United States v. Salemme</u>, No. 94-10287-MLW, 1997 WL 810057, at *1 (D. Mass. Dec. 29, 1997) (same).

### iv. Argument

**I.      <u>The Indictment Must Be Dismissed Where The Government's Theory Of Prosecution Does Not Give Rise Even to A Violation of Applicable Civil Labor Law.</u>**

The Indictment must be dismissed where the Government's theory of prosecution ignores established civil labor law applicable to the operation of "double breasted" businesses. Under that law, the Funds had no right or entitlement to the monies which the Government contends Defendants failed to pay them. The Indictment alleges Defendants owed money to the Funds for two specific reasons, neither of which survives scrutiny. First, it alleges that Defendants "defrauded" the Funds because the Defendants did not pay remittances for the time Union members worked for non-union company Air Quality on non-union projects, under an apparent theory that Air Quality was the alter ego of AQE, a signatory to the CBAs alleged to be at issue. Indictment, ¶¶ 11–15. But the law is clear that the alter ego theory through which a CBA may, in certain circumstances not present here, be applied to a non-union company does not apply in the situation the Indictment alleges: the non-union company, Air Quality, preceded the creation of the union company, AQE, and the Indictment fails to allege that the companies ever fraudulently shifted union work to Air Quality and indeed concedes the opposite. Second, the Government alleges that the Funds were owed remittances for "shop hours," but the CBAs do not mention or suggest that "shop hours" were included in the definition of "work" covered by the CBAs. They were not. Put simply, the Funds never had an entitlement to the monies of which the Government claims Defendants defrauded them.

a.   <u>The Elements of the Crimes Alleged In the Indictment.</u>

**Mail Fraud**

A violation of the mail fraud statute (Counts 1–18) requires "a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses . . . . "18 U.S.C. § 1341; <u>United States v. Montminy</u>, 936 F.2d 626, 627 (1st Cir.1991) ("The elements of mail fraud are: (1) devising or attempting to devise a scheme or artifice to defraud; (2) knowing and willful participation in the scheme with the specific intent to defraud; and (3) the use of the United States mails in furtherance of that scheme."); <u>McNally v. United States</u>, 483 U.S. 350, 356 (1987) ("Insofar as the sparse legislative history reveals anything, it indicates that the original impetus behind the mail fraud statute was to protect the people from schemes to deprive them of their money or property."). Thus, the Indictment alleges that Defendants "did place and cause to be placed in the United States mail remittance reports to the MLBF as set forth below which omitted hours worked by members of LIUNA Local 1421 and did thereby fail to remit approximately $2 million in contributions ***due and owing to the MLBF***." Indictment, ¶ 16 (emphasis supplied).

**Embezzlement**

The crime of theft or embezzlement from employee benefit plan (Count 19), as well, requires that a defendant took property that belonged to another: "Any person who embezzles . . . to his own use . . . any of the moneys . . . of any employee welfare benefits plan . . . shall be fined under this title, or imprisoned not more than five years, or both." 18 U.S.C. § 664. Attempting to comply with that legal requirement, the Indictment alleges that Defendants engaged in embezzlement by taking "monies and funds owed to the Massachusetts Laborers'

Health & Welfare Fund, the Massachusetts Laborers' Pension Fund, and the Massachusetts Laborers' Annuity Fund." Indictment, at ¶ 18.

### ERISA Fraud

Finally, the crime of making false ERISA statements (Counts 20–37) requires that the Government prove that AQE's remittance reports to the Funds were "false" because they did not include the Air Quality hours which were required by law to be included. Indictment, ¶ 20 (alleging that Defendants submitted "false remittance reports in which they knowingly omitted . . . hours worked by members of LIUNA Local 1421."); 18 U.S.C. § 1027 ("Whoever, in any document required by [ERISA] to be published . . . or certified to the administrator of any such plan, makes any false statement or representation of fact, knowing it to be false, or knowingly conceals, covers up, or fails to disclose any fact the disclosure of which is required by such title or is necessary to verify, explain, clarify or check for accuracy and completeness any report required by such title to be published or any information required by such title to be certified, shall be fined under this title, or imprisoned not more than five years, or both.").

  b.  The Funds Had No Entitlement to the Money the Indictment Alleges Defendants Failed to Pay Related to the Operation of Air Quality.

    i.  Courts apply the alter ego doctrine to impose liability on companies where union work is fraudulently shifted to a non-union company.

As this Court has explained the actual alter ego doctrine, "[t]he purpose of the [alter ego] doctrine is to prevent union employers from using phantom subsidiaries as a means of escaping their obligations under a CBA." A.A. Bldg. Erectors, Inc., 208 F. Supp. 2d at 98–99. Thus, "[t]he alter ego doctrine is most commonly used in labor cases to bind a new employer that continues the operations of an old employer in those cases where the new employer is 'merely a disguised continuance of the old employer." Trustees of Resilient Floor Decorators Ins. Fund v. A & M

Installations, Inc., 395 F.3d 244, 247 (6th Cir. 2005) (internal quotations omitted). It is the plaintiff's burden to prove that the employer created a "sham" *non-union company* to avoid its *existing* obligations by "shifting union work to a non-union company." Rodin., 558 F.3d at 1032.

The Ninth Circuit Court of Appeals aptly defined the "reverse alter ego theory," which civil plaintiffs, though apparently never before the Government, have consistently tried and failed to append to the alter ego doctrine:

> Whereas a traditional alter ego claim consists of a *union company* opening a *non-union company* to avoid *existing* collective bargaining obligations, the Union's novel 'reverse' alter ego claim consists of a *non-union company* allegedly opening a *union company* to avoid *future* collective bargaining obligations.

Rodin, 558 F.3d at 1032. Indeed, in 2009 the Ninth Circuit explained, "***We know of no court that has recognized a reverse alter ego doctrine, and at least one court that has explicitly rejected it***." Id (emphasis supplied).

In the seminal decision on this issue, the First Circuit in A.A. Building Erectors, Inc. [9] declined to apply the "reverse" alter ego doctrine to impose liability on a non-union company and described its careful reasoning for doing so, which other circuits have followed. 343 F.3d at 21–22. The First Circuit there upheld the decision of the District Court (Stearns, J.) granting summary judgment for the defendant-employers against plaintiffs-benefits funds' alter ego claims that the non-union company defendant was liable for contributions to union pension funds

---

[9] Defendants anticipate that the Government may cite to First Circuit law which precedes A.A. Building Erectors to claim the alter ego theory can apply here despite the fact that the non-union company, Air Quality, pre-existed the union company, AQE. Any such effort will be unavailing as those cases are inapposite. No First Circuit decision before A.A. Building considered the issue whether the alter ego doctrine applies where, as here, there is no allegation of deception about the relationship between the union and non-union companies' relationship and no allegation that the union was "worse off" because of some structural change. See Massachusetts Carpenters Cent. Collection Agency v. Belmont Concrete Corp., 139 F.3d 304, 305 (1st Cir. 1998) (union was clearly harmed because union company failed to make payments owed under CBA holding non-union company liable under alter ego doctrine); N.L.R.B. v. Hosp. San Rafael, Inc., 42 F.3d 45, 52 (1st Cir. 1994) (deferring to NLRB's application of alter ego doctrine based on "substantial evidence" standard where union company pre-existed non-union company and there was "anti-union animus"); C.E.K. Indus. Mech. Contractors, Inc. v. N.L.R.B., 921 F.2d 350, 355 (1st Cir. 1990) (deferring to NLRB's application of alter ego doctrine based on "substantial evidence" standard where there was clear evidence of "the important factor of anti-union animus").

under a CBA it never signed. Id. Where the non-union company pre-existed the agreement

nothing that defendant-employers did caused the union to be "worse off;" there was no evidence

or allegation that the union company fraudulently shifted work to the non-union company. Id. at

22. Indeed, as Judge Stearns explained in the underlying decision, the creation of the union

company and collective bargaining agreement after the non-union company *benefited* and did

not harm the union:

> [T]he peculiar facts of this case [where the non-union company existed before the union company] are at odds with the policy underlying the alter ego doctrine. The purpose of the doctrine is to prevent union companys from using phantom subsidiaries as a means of escaping their obligations under a CBA. ***In the context of this case, the question is whether [non-union company] created [union company] to avoid making contributions to the [union's] fund. The answer is rather self-evident.*** *See Architectural Iron Workers Local No. 63 Welfare Fund et al. v. United Contractors, Inc. and United Skys, Inc.* 46 F.Supp.2d 769, 789 (N.D.Ill. 1999)* ("We find, as did the court in *Favia*, that far from attempting to evade union obligations, the defendants, by creating Contractors and allowing to become a union shop, were responsible for benefit fund contributions that would not have otherwise been made.") ***The alter ego doctrine, in short, does not contemplate the case of a non-union company seeking a lawful means to employ union workers without sacrificing its non-union status.***

A.A. Bldg. Erectors, Inc., 208 F. Supp. 2d at 98-99 (emphasis supplied). First this Court, and

then the First Circuit, rejected the plaintiffs' theory that simply because the union company and

non-union company were "joined at the hip" "the legal obligations and liabilities of one are the

legal obligations and liabilities of the other." Id. at 20–21. As the First Circuit explained, the alter

ego doctrine is not applied "reflexively" just because companies share a number of

characteristics like continuity of ownership, management overlap, and similarity of business

purpose. Id.

The First Circuit articulated a key standard for assessing the applicability of the alter ego

doctrine that courts across the country have followed: the doctrine applies only "in the face of

some corporate 'change' which has caused a union to be in a worse position than it was in prior to

the change." Id. at 22; see Trustees of Resilient Floor Decorators Ins. Fund, 395 F.3d at 248 ("[B]ecause [there was no] alleg[ation] . . . that [the defendant] concealed its close relationship with [the other company] and because there is no indication that [the union] ha[d] not received the full benefit of its collective bargaining agreement[,] . . . the application of the alter ego doctrine [was] inappropriate . . . ."); Flynn v. Interior Finishes, Inc., 425 F. Supp. 2d 38, 56 ("Paraphrasing the First Circuit, 'there is no evidence that [Interior Finishes] deceived the union about its structure, ownership, relationship with [RHI], or the fact that [RHI] regularly subcontracts with non-unionized [installers].' Therefore, there is no equitable basis for holding RHI liable to make contributions to the Fund.") (quoting A.A. Bldg. Erectors, Inc., 343 F.3d at 22).

Thus, simply pointing out that a non-union company shares many similar characteristics with a union company does not entitle a plaintiff to bind the non-union company to a CBA: "Here, plaintiffs have provided us with *no reason to apply the doctrine other than* pointing out that, unbeknownst to them until recently, *many of the criteria necessary for an alter ego finding characterize the relationship between [non-union company] and [union company].* As we have explained*, this is not enough.*" A.A. Bldg. Erectors, Inc., 343 F.3d at 22 (emphasis supplied). [10] To conclude otherwise "would be tantamount to holding that a common ownership group cannot control affiliated but nominally separate corporations to service similar union and non-union markets-a proposition that would be at odds with circuit precedent." Id. at 23 (citing C.E.K. Indus. Mech. Contractors, Inc. v. N.L.R.B., 921 F.2d 350, 352 (1st Cir. 1990). This is especially so where the non-union company pre-exists the union company there is no evidence that the

---

[10] "The [alter ego] doctrine is not a formalistic mechanism for reflexively regarding distinct jural entities as legally interchangeable whenever the entities' relationship is marked by a sufficient number of the doctrine's characteristic criteria-e.g., continuity of ownership between the corporations, management overlap, similarity of business purpose, evidence that the non-union entity was created to avoid an obligation in a collective bargaining agreement." Id.

companies deceived the union about their "joined at the hip" relationship. Id. "This matters because arrangements such as those between [union company] and [non-union company] are neither uncommon nor inherently unlawful." Id. at 21–22. Notably, although the plaintiffs in A.A. Building Erecotrs were the union's benefits funds, the First Circuit focused on the existence of deception as to the union, not as to the funds. Id.

Following the lead of the First Circuit in A.A. Building Erectors, Inc., courts in the Ninth, Sixth, Seventh, and D.C. Circuits have rejected the use of the so-called "reverse alter ego" doctrine to require a union company to make remittances based on the hours employees work for a non-union company where, as here, the non-union company pre-existed the union company such that no union work was deceptively shifted to the non-union company. Rodin, 558 F.3d at 1032–33 ("We decline to recognize a 'reverse' alter ego doctrine. The alter ego doctrine was never intended to coerce a non-union company into becoming a union company by requiring its compliance with a collective bargaining agreement it never signed . . . ."); Trustees of Resilient Floor Decorators Ins. Fund v. A & M Installations, Inc., 395 F.3d 244, 247 (6th Cir. 2005) (concluding that plaintiff-trusts' argument that the alter ego doctrine could "permit liability to be imposed where a nonunion company establishes a union company and no preexisting labor obligations are disrupted" was "unpersuasive") (citing A.A. Bldg. Erectors); Flynn v. Interior Finishes, Inc., 425 F. Supp. 2d at 52-53 (granting summary judgment for defendant-employer because where the non-union company was formed before the union company the union was not "worse off" than before the union company was formed) (quoting A.A. Bldg. Erectors, 343 F.3d at 18, 21, 22); Chicago Dist. Council of Carpenters Pension Fund v. Vacala Masonry, Inc., 946 F. Supp. 612, 618 (N.D. Ill. 1996) (granting summary judgment for defendant-employer and concluding that the reverse alter ego doctrine is "patently inequitable and illogical," because a

company that has not signed a collective bargaining agreement cannot avoid such an agreement).

> ii.  A non-union's company's employment of union members does not justify the application of the alter ego doctrine.

In particular, courts have explained that union employees working for the non-union company in a "double breasted" operation does not justify the application of the alter ego doctrine. <u>Flynn</u>, 425 F. Supp. 2d at 52-53 (granting defendant-employers' motion for summary judgment).[11] In <u>Flynn</u>, for example, the United States District Court for the District of Columbia refused to apply the reverse alter ego doctrine to impose liability on the non-union company defendant where the non-union company undertook "the very same work [as the union company] with many of [the union company's] former unionized employees, but now on a non-union basis." <u>Id</u>. at 54. There, the non-union company preceded the formation of the union company, but at a certain point the union company slowed its business to the point where many of its unionized employees began working for the non-union company instead of the union company. <u>Id</u>. The court concluded that the plaintiff-fund's assertion that as a result of the shift of employees to the non-union company the fund had "received less contributions than it was due" was "without merit." <u>Id</u>. Citing <u>A.A. Building Erectors</u>, the court explained that the plaintiff-fund was not "worse off" because the non-union company did not take any union work. <u>Id</u>. Critically, it was "simply incorrect to suggest that [the non-union company] has begun performing these [union] projects on a non-union basis." <u>Id</u>.

---

[11] In <u>Rodin</u>, as well, there was evidence in the summary judgment record that union members worked for the non-union company and the Ninth Circuit there held that there was no basis for imposing liability upon the defendant-employers. <u>See</u> SOUTHERN CALIFORNIA PAINTERS & ALLIED TRADES, District Council No. 36, Plaintiff and Appellant, v. RODIN & CO., INC., and, Southern California Painting, Inc., Defendants and Appellees., 2006 WL 4040448, at *7 (C.A.9) ("[Non-union company's] and [union company's] painters were also interchanged."), Opening Brief of Plaintiff-Appellant, a true and correct copy of which is attached here as <u>Exhibit F</u>. Consistent with <u>A.A. Building Erectors</u>, the Ninth Circuit did not find that evidence relevant in ruling in favor of defendant-employers on their motion to dismiss plaintiff-funds' alter ego claim. 558 F.3d at 1032–33.

Indeed, and as the Government is surely aware, it would be a violation of the National Labor Relations Act for Air Quality, or any non-union employer, to discriminate in hiring laborers because of their status as union members. "It shall be an unfair labor practice for an employer . . . to interfere with [the employment rights] guaranteed in section [157] . . . by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . . " 29 U.S.C. § 158; N.L.R.B. v. Town & Country Elec., Inc., 516 U.S. 85, 98, 116 S. Ct. 450, 457, 133 L. Ed. 2d 371 (1995) (even paid union organizers (and by implication unpaid organizers or union members) may be protected individuals under the National Labor Relations Act).

  c. The Indictment Must Be Dismissed under A.A. Building Erectors and its Progeny.

A.A. Bldg. Erectors and its progeny establish that Air Quality never owed the Funds remittances for time Union members performed work for it. 343 F.3d at 21–22. Air Quality preceded the formation and operation of AQE, by almost two decades, and the Indictment does not allege—because it cannot—that Air Quality ever fraudulently performed union work so that AQE could avoid its CBA obligations. Id.

An allegation that the Defendants ever fraudulently shifted union work from AQE to Air Quality is strikingly absent from the Indictment, which *concedes* the opposite—that work was done by Air Quality "depending upon the unique circumstances of each job" and "whenever conditions permitted." Indictment, ¶ 12. Defendants' research has not revealed a single case in which any court has imposed civil, let alone criminal, liability based upon the species of fraud alleged in the Indictment, namely the alleged concealment from the Funds that union members worked for the non-union company on non-union projects. Id. ¶¶ 11–15. Indeed, in the A.A. Building Erectors line of decisions discussed above courts do not focus on any alleged fraud as to the Funds, as opposed to the Union, but an alleged fraud as to the Funds is, improperly, the

*sole* focus of the Indictment.[12] Id; A.A. Bldg. Erectors, Inc., 343 F.3d at 22 (explaining "there is no evidence that A.A. Building deceived the [union]").

Likewise, the Indictment fails to allege a fraudulent change in the corporate structure after AQE was established and signed a CBA. Given the lack of any allegation of fraud as to the Union generally or as to fraudulently shifting union work to Air Quality in particular, the Indictment "ha[s] provided . . . no reason to apply the [alter ego] doctrine other than . . . criteria necessary for an *alter ego* finding characterize the relationship between [non-union company] and [union company]. As we have explained, ***this is not enough.***" A.A. Bldg. Erectors, Inc., 343 F.3d at 22 (emphasis supplied).

Ironically, the only corporate "change" mentioned in the Indictment, e.g., the establishment of AQE, caused the Union to be in a ***better*** position than it had been previously. AQE was formed as a union company and a party to the CBA, Indictment, ¶ 9, as a result of which Union laborers received work and the Funds received remittances they would not have otherwise received from a non-union company like Air Quality. "The alter ego doctrine, in short, does not contemplate the case of a non-union company seeking a lawful means to employ union workers without sacrificing its non-union status." A.A. Bldg. Erectors, Inc., 208 F. Supp. 2d at 98-99.[13]

---

[12]  Although not material to Defendants' Motion to Dismiss the Indictment, it is indisputable here that the Union was aware of and not deceived in any respect by the formation, operation and corporate structure of Air Quality and AQE, including the fact that some union members worked at times for non-union company Air Quality. The memorandum written by counsel to the Funds itself describes Air Quality as a non-union company "known" to the Funds. Exhibit A, at 3. Further, the Funds themselves informed union members who performed work for Air Quality that they were not entitled to union benefits for that work. As an example, in a letter dated May 19, 2011 the Funds wrote to union member Dave Manuel Ortega, copying a union representative, explaining that he was not entitled to union benefits for his work for non-union company Air Quality. A true and correct copy of that letter is attached hereto as Exhibit G.

[13]  Indeed, the real world result of Defendants' actions as alleged in the Indictment lays bare the absurdity of applying the alter ego doctrine under these circumstances. The formation of AQE ***benefited*** rather than harmed the Funds, a reality which courts have recognized in rejecting the theory advanced by the Government here. See Architectural Iron Workers Local No. 63 Welfare Fund et al. v. United Contractors, Inc. and United Skys, Inc. 46 F.Supp.2d 769, 789 (N.D.Ill. 1999) ("We find, as did the court in *Favia*, that far from attempting to evade union obligations, the

Finally, to the extent the Government attempts to rescue its Indictment by relying upon Defendants' alleged fraudulent remittances to the Funds after the establishment of AQE in 2005, such reasoning is impermissibly circular. Based upon established law, the remittances simply were not fraudulent because the "double breasted" businesses were not unlawful. Reliance upon the remittances referenced in the Indictment of necessity impermissibly assumes an incorrect conclusion. The Court should reject the Government's proposed radical transformation and expansion of the alter ego doctrine here in a manner which conflicts with even civil labor law.

### d.   Defendants Never Owed The Funds Remittances for "Shop Hours."

Based upon the plain language of the CBAs referenced in the Indictment, Defendants likewise never owed remittances to the Funds for "shop hours."  Although the Government relies on the term "shop hours" in the Indictment, it is not mentioned anywhere in the CBAs, and the actual definition of work—upon which the Government relies heavily—does *not* include any of the activities the Government includes in the definition of "shop hours" it wrote for the Indictment. Without referencing the CBAs at all the Government alleges that union members were entitled to have the terms of the CBA applied to "time spent preparing and traveling to a job site at the beginning of the day and returning an unloading trucks and equipment at the end of the day." Indictment, at ¶ 14. In the context of a motion to dismiss, that legal conclusion is not entitled to any weight.

Nothing in the section of the CBAs upon which the Indictment relies for its definition of "work," Article XVIII, Section 2, refers to anything that the Indictment defines as "shop hours." The subject section does not cover preparation time generally, travel time, or unloading time.

---

defendants, by creating Contractors and allowing it to become a union shop, were responsible for benefit fund contributions that would not have otherwise been made.") (cited with approval in Massachusetts Carpenters Cent. Collection Agency v. A.A. Bldg. Erectors, Inc., 208 F. Supp. 2d 94, 98-99 (D. Mass. 2002) aff'd, 343 F.3d 18 (1st Cir. 2003)).

Indictment, at ¶¶ 8, 14. To the contrary, the terms of the CBA indicate that travel time is intentionally excluded from the ambit of covered work and Article II, Section 7 states that, as to "Subcontracting," the terms of the CBAs are not applicable to subcontractors for "transportation or trucking." Exs. C, D, and E at Article II, Section 7. In other words, the Government has taken it upon itself to rewrite the CBAs for purposes of the Indictment so as to require remittances to be paid to the Funds for time and tasks not included in the description of covered work. Doing so does not change the fact that based upon the CBAs the Funds were never entitled to remittances related to the Government's "shop hours" and demonstrates only that the Government is seeking to criminalize behavior that is not unlawful even in a civil contractual context.

## II.     The Court Should Dismiss The Indictment On Vagueness Grounds.

The Indictment should be deemed void for vagueness where, particularly in light of the civil law discussed above, no ordinary person could have known that the conduct alleged in the Indictment constitutes a crime. Kolender v. Lawson, 461 U.S. 352, 357 (1983). The First Circuit's decision in A.A. Bldg. Erectors makes clear that the Government here is attempting to criminalize behavior that even in the civil context is "neither uncommon nor inherently unlawful." A.A. Bldg. Erectors, Inc., 343 F.3d at 21–22. As the Government knew pre-Indictment, sophisticated labor counsel for the Funds concluded that "*[g]iven the court's skepticism about union companies established after known non-union companies, AQE/Air Quality Experts is not a good candidate for an alter-ego based collection suit at this time*." Exhibit A, at 3 (emphasis supplied).

In these circumstances, the criminal statutes the Indictment places at issue must be held void for vagueness as applied where they do not "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that

does not encourage arbitrary and discriminatory enforcement." <u>Kolender</u>, 461 U.S. at 357. The Fifth Amendment's Due Process Clause mandates that the conduct for which a person is held criminally accountable "be prohibited with sufficient specificity to forewarn of the proscription of said conduct." <u>United States v. Anzalone</u>, 766 F.2d 676, 678 (1st Cir.1985). That fair notice requirement is essential "to enable the ordinary citizen to conform his or her conduct to the law." <u>City of Chicago v. Morales</u>, 527 U.S. 41, 58, 119 S. Ct. 1849, 1860, 144 L. Ed. 2d 67 (1999). "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." <u>Lanzetta v. New Jersey</u>, 306 U.S. 451, 453 (1939). "Ordinary people" cannot be expected to know that the allegations of the Indictment comprise a crime when even sophisticated lawyers analyzing the issue on behalf of the alleged "victims" do not recognize a violation of the civil laws.

The Supreme Court has consistently rejected the Government's efforts to bend the criminal laws to its prosecutorial needs, including efforts to misuse the mail fraud statute. In <u>McNally v. United States</u>, for example, the Supreme Court reversed a conviction under the mail fraud statute at issue here because it recognized that the Government had overreached the boundaries of that law where it prosecuted a defendant-politician for alleged fraud regarding "the intangible right of the citizenry to good government." 483 U.S. 350, 356 (1987). The statute was actually about protecting people from schemes to defraud them of "money or property," the Supreme Court explained, and "[i]f Congress desires to go further, it must speak more clearly than it has." <u>Id</u>. at 356, 360. When Congress thereafter did "speak more clearly" by passing a statute ensuring the right of the citizenry to "honest services," 18 U.S.C. § 1346, the Government responded by again attempting to improperly expand the boundaries of that statute with respect to alleged conflicts of interest. <u>Skilling v. United States</u>, 561 U.S. 358, 410-11 (2010). In the

recently argued <u>McDonnell v. United States</u>, the Justices at least indicated at oral argument that

by prosecuting the Governor of Virginia for, among other things, agreeing to arrange meetings

for certain constituents the Government had once again surpassed any conceivable limits of what

any "ordinary person" could understand to be a crime. As Justice Breyer explained in criticizing

the use of criminal laws focused on bribery to prosecute Governor McDonnell:

> Now, why do I think that's a problem? Two very fundamental reasons. And it's not because I'm in favor of dishonest behavior. I'm against it. And we have just listed some that is dishonest. My problem is the criminal law as the weapon to cure it. And if the criminal law is the weapon that goes as far as you want, there are two serious problems.
>
> One, ***political figures will not know what they're supposed to do and what they're not supposed to do, and that's a general vagueness problem***. And the second is, I'd call it a separation of powers problem. The Department of Justice in the Executive Branch becomes the ultimate arbiter of how public officials are behaving in the United States, State, local, and national. And as you describe it, for better or for worse, it ***puts at risk behavior that is common, particularly when the quid is a lunch or a baseball ticket, throughout this country***.
>
> Now, suddenly, to give that kind of power to a criminal prosecutor, who is virtually uncontrollable, is dangerous in the separation of powers since. So in my mind -- right in this case, nothing to do with this Petitioner, nothing to do with him, but in this case, is a -- as fundamental a real separation of powers problem as I've seen.

<u>McDonnell v. United States</u>, No. 15-474, Transcript of Oral Argument (Apr. 27, 2016), at 31:21–

32:20, a true and correct copy of the cited portion of which is attached hereto as <u>Exhibit H</u>

(emphasis supplied). Chief Justice Roberts, as well, remarked that the Supreme Court's decision

to limit the honest services statute in <u>Skilling</u> (rather than striking it down) may have been "ill-

advised." <u>Id</u>. at 50:11–18 ("And now maybe the – the experience we've had here, and the

difficulty of coming up with clear enough instructions suggests that the caution the Court showed

[in not striking down the statute] at that point was ill-advised.").

The Indictment presents the same problem. Here, as in the honest services area, the

Government seeks to stretch the criminal laws to prosecute conduct that no "ordinary person"

could recognize as a crime. The First Circuit has made clear that the centerpiece of the

Indictment's alter ego allegation, e.g., that Air Quality and AQE were "joined at the hip" in the operation of union and non-union companies is "neither uncommon nor inherently unlawful" and "not enough." For those reasons, allegations of the Indictment are "not enough" to provide warning to ordinary citizens about the boundaries of the criminal laws at issue here. <u>A.A. Bldg. Erectors, Inc.</u>, 343 F.3d at 21–22. The Indictment should be dismissed on vagueness grounds.

### vi. Conclusion

For all of the reasons set forth above, the Court should dismiss the Indictment in its entirety.

Respectfully submitted,

| | |
|---|---|
| CHRISTOPHER THOMPSON and AIR QUALITY EXPERS, INC., | KIMBERLY THOMPSON and AQE, INC., |
| By their attorneys, | By their attorneys, |
| /s/ Benjamin J. Wish | /s/ Michael J. Connolly |
| Howard M. Cooper (BBO #543842) | Michael J. Connolly (BBO # 638611) |
| Benjamin J. Wish (BBO #672743) | HINCKLEY, ALLEN & SNYDER, LLP |
| TODD & WELD LLP | 28 State Street |
| One Federal Street | Boston, MA 02109 |
| Boston, Massachusetts 02110 | (617) 345-9000 |
| (617) 720-2626 | |

Dated: May 19, 2016

CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that I served a true copy of the above document upon all parties with an interest in this matter by electronically filing through this Court's CM/ECF filing system this 19th day of May, 2016.

/s/ Benjamin J. Wish
Benjamin J. Wish, Esq.